Document Number Case Number
                 07-C-0076-C
United States District Court
Western District of Wisconsin
Theresa M. Owens

Filed/Received
04/03/2007 05:12:47 PM CDT

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

**ARANDELL CORPORATION,** *et al.,*

        **Plaintiffs,**

    **vs.**

**XCEL ENERGY INC.,** *et al.,*

        **Defendants.**

**CASE NO. 07-C-0076-C**

---

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' REQUEST FOR DISCOVERY ON JURISDICTIONAL ISSUES

---

Plaintiffs Arandell Corporation, Merrick's, Inc., Safety-Kleen Systems, Inc. and Sargento Foods Inc., by their attorneys, respectfully submit this memorandum in support of their request for discovery on jurisdictional issues.

## BACKGROUND

Plaintiffs are Wisconsin commercial entities that purchased natural gas between January 1, 2000 and October 31, 2002 (the "Relevant Time Period"). The plaintiff class has not yet been certified, but federal Energy Information Agency ("EIA") data indicates that there are thousands of industrial, commercial and institutional users of natural gas in Wisconsin. (Affidavit of William E. Fischer Submitted in Support of Motion to Remand—hereinafter "Fischer Aff."—¶ 2, Ex. B).

The plaintiffs allege that during the Relevant Time Period, the defendants were members of a conspiracy prohibited by Wis. Stat. § 133.03. (Complaint ¶¶ 51-53, 57). Specifically, the defendants were part of a conspiracy that sought to restrain trade or commerce relating to natural gas. (*Id*.). Because of this conspiracy, the price that purchasers paid for natural gas in

Wisconsin increased substantially.  (*Id.* ¶¶  37, 54, 57, 58; *see also* Fischer Aff. Ex. Q).  This cost

Wisconsin businesses and institutions millions of dollars.  (Complaint, ¶ 37).  The complaint

alleges that the substantial price increase that occurred during the relevant time period in

Wisconsin resulted from the manipulative actions of the defendants.  (Complaint  ¶ 54).

There is substantial evidence that the natural gas price spikes that have hurt the

Wisconsin economy are not due to just normal "supply and demand" fluctuations.  A 2006 report

commissioned by the attorneys general of Wisconsin, Illinois, Iowa and Missouri, concludes:

> [T]he widespread reliance on natural gas commodity markets to set
> the price paid by consumers is an extremely recent phenomenon,
> just over 15 years old. As evidenced by the wild, irrational swings
> in natural gas prices [during the time period of 2000-2005], these
> new markets have not worked very well. They are deemed to be
> 'inefficient' in technical academic studies **and have a history of
> manipulation, abuse and misreporting.**
>
> **. . .** Many in the industry believe these markets lack transparency
> and **are vulnerable to abuse and manipulation**. Regulators have
> failed to lay these concerns to rest because the vast majority of gas
> trading is subject to little monitoring or oversight. While regulators
> and policymakers have been scrambling to reform the market rules
> for this commodity, they have yet to impose comprehensive
> oversight and accountability.

Mark N. Cooper, *The Role Of Supply, Demand And Financial Commodity Markets In The*

*Natural Gas Price Spiral,* 3 (March 2006)[1] (excerpts attached to Declaration of Alexander T.

Pendleton in Support of Motion for Jurisdictional Discovery—hereinafter "Pendleton Dec."—as

Ex. A); *see also In re Natural Gas Commodities Litigation*, 337 F. Supp. 2d 498 (S.D.N.Y.

2004) (denying joint motion to dismiss)[2]; 358 F. Supp. 2d 336 (S.D.N.Y. 2005) (denying

---

[1] Available at:  http://www.doj.state.wi.us/docs/naturalgas.pdf.

[2] The allegations in the plaintiffs' complaint come as no surprise to the defendants, or as was put by Judge
Marrero in *In re Natural Gas Commodities Litigation* in a decision released now over two years ago:

> Pervading much of Defendants' motions [to dismiss] are variants of the theme, so
> common in motions to dismiss, that the complaint amounts to nothing more than

separate motion to dismiss); 231 F.R.D. 171 (S.D.N.Y. 2005) (certifying class of persons who purchased or sold NYMEX natural gas futures contracts between January 1, 2000 and December 31, 2002) (judgment entered May 24, 2006 approving partial settlements of $72,625,000).

The actions of the Defendants as a whole have led to the federal government ordering the natural gas industry to pay fines for natural gas price manipulation during the Relevant Time Period of over four billion dollars.  (Fischer Aff. Ex. P).  For example, the eleven companies that have moved for dismissal are connected to such federal government fines as follows:

| Company | Named in a CFTC order? | Fine Amount | Date | Docket |
|---------|------------------------|-------------|------|--------|
| AEP Energy Services, Inc. | Yes, CFTC ($30MM), and Justice Dept. ($30MM) | $60MM | 1/26/05 | 03-cv-891, S.D. Ohio |
| American Electric Power Company, Inc. | Yes, CFTC (jointly with AEP Energy Services, Inc.) | $30MM | 1/26/05 | 03-cv-891, S.D. Ohio |

---

lots of sound and fury, signifying nothing. With exceptions discussed below, most of the Defendants argue that the complaints fail to state a claim against them and provide insufficient notice of the Plaintiffs' claims. . . . The Court is, for the most part, not persuaded that these Defendants are ingénues making their first appearance at the debutante ball. In fact, if certain federal government proceedings describing the scheme of misconduct asserted in this case bear any measure of truth, many of the thirty Defendants here may have compromised their claim to Snow-White innocence long ago. A large number of Defendants have reached settlements with the Commodities [sic] Futures Trading Commission ("CFTC") for millions of dollars each to resolve charges grounded on the same claims of false reporting of trade data alleged here. As explained below, Plaintiffs here essentially endeavor to connect Defendants' alleged false reporting of trade data in the physical gas market to manipulation of the natural gas futures market. In light of the liberal notice pleading standard governing federal litigation, and the recently concluded investigations by the CFTC and the Federal Energy Regulatory Commission ("FERC") into the same underlying conduct by Defendants as alleged in this case-proceedings that resulted in over $100 million in fines already paid by them-the Court for the most part cannot ignore common sense and accept Defendants' intimations of surprise that Plaintiffs' complaint in this action is the first thing they have heard about these allegations and that it does not furnish enough notice of what these claims could possibly relate to.

*Id.,* 337 F. Supp. 2d at 500-01.

| Cantera Gas Company, LLC (f/k/a CMS Field Services) | Yes, CFTC (jointly with CMS Marketing Services and Trading Company | $16MM | 11/25/03 | 04-05 CFTC |
|---|---|---|---|---|
| CMS Energy Corporation | Named as the holding company for respondents in 04-05 CFTC, in which CMS Energy Resource Management Company was ordered to pay a fine of $16MM. | | | |
| CMS Energy Resource Management Company (f/k/a CMS Marketing Services and Trading Company) | Yes, CFTC (jointly with CMS Field Services, n/k/a Cantera Gas Company, LLC) | $16MM | 11/25/03 | 04-05 CFTC |
| Duke Energy Carolinas, LLC, successor in interest to Duke Energy Corp. | Duke Energy Corp. is identified as the holding company for Duke Energy Trading and Marketing ("DETM") in CFTC 03-26, in which DETM was ordered to pay a fine of $28MM. | | | |
| Dynegy, Inc., (parent corporation of Dynegy GP, Inc. DMT Holdings, LP) | Dynegy, Inc. is the parent of the other two Dynegy entities (Dynegy GP, Inc., and DMT Holdings, LP), who do business as "Dynegy Maketing and Trade" as general partners, in which Dynegy Marketing and Trade was ordered to pay a fine of $5MM. | | | |
| Dynegy GP, Inc., DMT Holdings LP | Yes, CFTC, as general partners of Dynegy Marketing & Trade | $5MM. | 12/18/02 | 03-03, CFTC |
| ONEOK Inc. | Yes, CFTC (jointly with ONEOK Energy Marketing and Trading | $3MM | 1/28/04 | 04-09 CFTC |

|  | Company) |  |  |  |
|---|---|---|---|---|
| Reliant Energy, Inc. f/k/a Reliant Resources | Named as the holding company for Reliant Energy Services, Inc., in CFTC 04-06, in which Reliant Energy Services, Inc. was ordered to pay a fine of $18MM.[3] |  |  |  |

(*See* Declaration of Alexander T. Pendleton—hereinafter "Pendleton Dec."—¶ 2.)  **Although the fines identified above are significant, none of the plaintiffs in this case, or the class members they seek to represent, have received any portion of those fines collected by the federal government.  It is only through this case that the plaintiffs can obtain a refund of the wrongfully inflated amounts they paid for natural gas during the Relevant Time Period.**

The CFTC orders report a virtually identical pattern of abuse, *i.e.*, that the defendants during the Relevant Time Period knowingly reported false information, including price and volume information, to reporting firms so as to skew published indexes.  (*Id.*)  This was done so as to benefit their trading positions.  (*Id.*)  The CFTC orders describe many of the defendants (i) as having provided natural gas marketing services to industrial, commercial, utility and municipal energy users throughout the United States (*see, e.g., id.,* Ex. C at 2 re CMS Marketing Services and Trading Company, and Ex. D at 2 re Coral Energy Resources, L.P.); (ii) as being among the largest North American providers of natural gas, (*see, e.g., id.,* Ex. G  at p. 3 re El Paso Corporation, and its wholly owned subsidiary El Paso Merchant Energy, L.P., which conducted El Paso Corporation's marketing and trading of natural gas, and was a large trader of natural gas futures and options contracts); and (iii) marketing natural gas to a wide range of customers across North America (*see, e.g., id.,* Ex. J at p. 3 re Reliant Resources, Inc. and its wholly-owned subsidiary Reliant Energy Services, Inc.).

---

[3] In addition to the fines identified in the above chart, the federal government has ordered other defendants in this case to pay millions of dollars in fines.  (*See* Pendleton Aff. ¶ 2.)

In addition to the defendants being ordered to pay historically unprecedented fines by the CFTC for price manipulation, numerous individuals in the employ of the defendants during the Relevant Time Period have been indicted for, convicted of, or pled guilty to, criminal charges in connection with their roles in manipulating natural gas prices during the relevant time period.

| Defendant | Employee or former employee with Criminal Charges | Disposition of Criminal Case |
|---|---|---|
| Duke (Mirant/Cinergy) | Paul Atha, Christopher J. McDonald, and Michael Whalen | Pled guilty to charges of conspiracy to manipulate prices |
| Williams Energy Marketing & Trading | Thomas J. Pool and Brion Scott McKenna | Pled guilty to charges of price manipulation |
| | Darryl Russell Brown | Pled guilty to charges of conspiracy to manipulate prices |
| Reliant Energy Services | Jackie Thomas, Reggie Howard, Lisa Flowers, and Kevin Frankney | Currently under indictment |
| El Paso Corporation | Todd Geiger | Convicted of false reporting of trades |
| | Jim Brooks, James Pat Phillips | Currently under indictment |
| | William Ham, Dallas Dean, Donald Guilbault, and Donald E. Burwell | Pled guilty to charges of false reporting of trades |
| | Greg Singleton | Convicted of wire fraud |
| Reliant Energy, Inc. | Jerry A. Futch, Jr. | Pled guilty to charges of false reporting of trades |
| Dynegy, Inc. | Michelle Marie Valencia | Convicted of wire fraud |

(Pendleton Dec. ¶ 4.   American Electric Power Company, Inc. and American Electric Power

Energy Services, Inc. (both movants for dismissal in this case on personal jurisdiction grounds)

have paid a criminal fine of $30 million to the Department of Justice, and Williams Power Co.

has also paid $50 million to settle criminal allegations, in addition to the civil penalties described

above.  (Pendleton Dec. ¶ 5.

There is also substantial evidence that several of the parent corporation movants,

immediately after the Relevant Time Period was over, shut down or discontinued operations in

their natural gas trading subsidiaries, which actions may have left those subsidiaries with

inadequate assets to pay any judgment in this case that may be entered against them:

| Parent/Moving Defendant | Trading Subsidiary/Business Unit | Announcement regarding Contraction of Trading Activity |
|---|---|---|
| American Electric Power Company, Inc. (AEP) | AEP Energy Services (AEPES)[4] | October 10, 2002:  AEP Chairman, President and CEO E. Linn Draper announces "a significant downsizing of our trading and marketing operations," *i.e.*, AEPES. |
| CMS Energy Corporation | CMS Energy Resource Management Co., fka CMS Marketing, Services and Trading (CMS-MST)[5] | April 8, 2003:  CMS Energy Chairman and CEO Ken Whipple announces the sale of CMS-MST's energy trading portfolio, with the eventual goal of phasing out the CMS-MST business and closing its offices. |
| Duke Energy | Cinergy Marketing and Trading, LP | June, 2006:  Duke President and CEO James Rogers announces sale of business to Fortis |
| | Duke Energy North America and Duke Energy Merchants | April 11, 2003:  Duke President and CEO Fred Fowler announces the closure of proprietary trading groups. |
| Dynegy Inc. | Merchant energy operation | October 16, 2002: Dynegy interim CEO Dan Dienstbier |

---

[4] Also a moving defendant.

[5] Also a moving defendant.

| | | announces abandonment of Dynegy's merchant energy operation |
|---|---|---|
| | Dynegydirect.com | June 20, 2002:  Dynegy spokesman confirms that it is shutting down its power and energy product trading website, for which Dynegy served as a market maker. |
| Reliant Energy, Inc., fka Reliant Resources, Inc. | Proprietary trading | March 7, 2003:  Announces closure of proprietary trading desk. |

(Pendleton Dec. ¶ 6.)

In response to the plaintiffs' complaint, the above eleven defendants have brought motions to dismiss alleging that this court lacks personal jurisdiction over them.

In support of their motions to dismiss, the defendants have submitted a series of short declarations asserting that the defendant in question do not have certain contacts with the State of Wisconsin.  Most of the movants, however, acknowledge that they are affiliated with energy trading companies that are also defendants in this case, and which either may have sold natural gas to the Wisconsin markets, or which have not moved to dismiss on personal jurisdiction grounds.  (*See e.g.,* Radous Declaration (AEPES) ¶ 1, 6; Smith Declaration (AEP) ¶ 6; Jines Declaration (REI) ¶ 4; Grimshaw Declaration (Oneok) ¶¶ 5-6; Dauphin Declaration (Centerpoint Energy Inc) ¶ 1; Harrington Declaration (Duke) ¶ 16; Wall Declaration (Duke) ¶ 3).  None of the declarations deny that the price manipulation alleged in the complaint occurred, deny that the companies in question or their affiliates have been ordered to pay substantial fines by the federal government, or deny that the false reporting of natural gas trades that occurred during the Relevant Time Period affected the prices commercial entities paid for natural gas in Wisconsin.  Some of the affidavits, in a conclusory fashion, seek to assert that there is no basis for "piercing the corporate veil" or otherwise

disregarding the corporate entity distinction between the parent corporations in this case, and the wholly-owned subsidiary corporations in this case. (*See* Radous Declaration (AEPES) ¶¶ 3-4; Smith Declaration (AEP) ¶¶ 3, 5-7; Jines Declaration (REI) ¶¶ 15-16; Grimshaw Declaration (Oneok) ¶ 6; Dauphin Declaration (Centerpoint) ¶ 1; Harrington Declaration (Duke) ¶¶ 16-18; Batson Declaration (Duke) ¶ 9; Wall Declaration (Duke) ¶ 7).  As explained further below, those affidavits fail to address many of the factors that courts consider when deciding whether a parent corporation should be responsible for the wrongful acts of a subsidiary.

### THIS COURT SHOULD ALLOW THE PLAINTIFFS TO CONDUCT JURISDICTIONAL DISCOVERY.

#### A.      Personal Jurisdiction and This Case.

The burden the plaintiffs will have to meet to show that this Court has personal jurisdiction over the defendants is not a high one:

> Every personal jurisdiction issue requires a two-step inquiry.  It must first be determined whether defendants are subject to jurisdiction under Wisconsin's long-arm statute.  If the statutory requirements are satisfied, then the court must consider whether the exercise of jurisdiction comports with due process requirements.  "**[P]laintiff has the minimal burden of establishing a prima facie threshold showing that constitutional and statutory requirements for the assumption of personal jurisdiction are satisfied.**"  In this review, we may consider documentary evidence and weigh affidavits in reaching a determination as to whether this burden has been met.  **"Factual doubts are to be resolved in favor of the plaintiff."**

*Kopke v. A. Hartrodt S.R.L.,* 2001 245 Wis. 2d 396, 629 N.W.2d 662 (2001) (citations omitted) (emphasis added);  *see also K.W. Muth Co. v. Gentex Corp.*, No. 06-C-0378-C, 2006 WL 2772828, *2 (W.D. Wis. Sept. 22, 2006) (Crabb, J. presiding) (applying *Kopke* to deny a motion to dismiss); *Armament Systems and Procedures, Inc. v. Radioshack Corporation Team Products Int'l*, No. 04-c-00457, 2005 WL 1876102 (E.D. Wis. Aug. 8, 2005) (applying the same analysis as the court in *Kopke*).  The Wisconsin long-arm statute, Wis. Stat. § 801.05, provides

jurisdiction to the full extent permitted by due process." *Tecre Co., Inc. v. Buttonpro Inc*., 387 F. Supp. 2d 927, 930 (E.D. Wis. 2005). The statute is to be "given a liberal construction in favor of the exercise of jurisdiction." *Schroeder v Raich*, 89 Wis. 2d 588,593, 278 N.W. 2d 871 (Wis. 1971).

Although there are few antitrust cases discussing personal jurisdiction under Wisconsin's long-arm statute, the ones that do suggest that the burden that must be met by a plaintiff in such a case is a low one. For example, in *Thill Securities Corp. v. New York Stock Exchange*, 283 F. Supp. 239 (E.D. Wis. 1968), the plaintiffs commenced a claim under the Clayton Act, 15 U.S.C.A. § 15 (the federal version of Wis. Stat. § 133.18), on behalf of themselves and all similarly situated broker-dealer businesses that had been damaged by the NYSE monopolistic activities. The NYSE moved to dismiss for lack of personal jurisdiction, alleging that it had insufficient contacts with Wisconsin such that under what is now Wis. Stat. § 801.05(4)[6] a court could exercise jurisdiction over it. Judge Reynolds had the following comments about § 801.05(4):

> In this case, plaintiff, a Wisconsin corporation, alleges 'injury' to its 'property'; namely, its business, 'within this state,' arising out of 'act(s)' or 'omission(s)' by defendant. Clearly, little else is required . . . .
>
> …
>
> "Three jurisdictional facts are required by [§ 801.05(4)]: (i) an act or omission outside the state by the defendant or his agent; (ii) an injury to person or property within the state which is claimed to arise out of the foreign act or omission; and (iii) some additional contact, not necessarily related to the injury sued on, which links the defendant to the state. * * *

---

[6] The plaintiffs will argue in opposition to the defendants' 12(b)(2) motions to dismiss that Wis. Stat. § 801.05(4) applies in this case.

10

> The jurisdictional facts required by this subsection call for proof of two contacts between the defendant and the state: (i) the occurrence in the state of the injury which the defendant is claimed to have caused; and (ii) some additional contact not necessarily related to that injury. * * *
>
> If the occurrence in the state of the injury sued on is not a sufficient contact, very little more by way of additional contact is required for the exercise of personal jurisdiction in these cases. This concept that personal jurisdiction may be grounded on the contacts made up of the local injury plus something more (often very little more) has grown recently and rapidly out of the older 'doing business' concept."

*Id.* at 243-44 (quoting from the official 'Revision Notes' for § 262.05(4), prepared by Professor G. W. Foster, Jr., of the University of Wisconsin Law School who served as reporter for the Wisconsin Judicial Council in the preparation of the revised Chapter 262).

Based on the definition of the class in this case, all of the injury involved in this case occurred in Wisconsin, because it was Wisconsin commercial entities that paid more for the natural gas they purchased than they otherwise would have absent the defendants' manipulative acts.

Plaintiffs believe they can establish, through discovery, that it was known in the industry and by the defendants that (i) commercial end users in Wisconsin commonly entered into long-term natural gas supply contracts that contained adjustable price provisions, whereby the prices were set by the prices published in industry publications; and (ii) if traders manipulated their reports to publications so as to increase published prices, that would adversely affect consumers. It was known in the industry and by the defendants that inflated published prices, while benefiting natural gas producers and sellers, caused economic harm to purchasers, including end purchasers. Sellers that manipulated published prices knew that false reports made by them

would affect purchasers in Wisconsin. But plaintiffs can only establish a sufficient record if the Court allows the plaintiffs to engage in jurisdictional discovery.

Of course, "the placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed towards the forum State." *Asahi Metal Indus. Co. Ltd. v Superior Court of Cal.,* 480 U.S. 102, 112 (1987). But the "more" here is the knowledge that manipulating published prices would affect purchasers, including purchasers in Wisconsin. This is not a case in which the traders believed their manipulation of prices would only affect prices in one local area; plaintiffs believe they will be able to establish that traders **knew** that their manipulation of prices would affect prices to purchasers in Wisconsin. *See also Calder v. Jones*, 465 U.S. 783 (1984) (holding that a California court could exercise jurisdiction of a writer and editor located in Florida, because the harmful effects that flowed from a defamatory story created by them in Florida, occurred primarily in California where the defamed person resided and did business). This is not a case in which all that can be established is that there was a local dealer that sold a defective product and it was merely possible that the product the dealer sold may ultimately end up in the forum state,[7] but a case in which the defendants knew that the false price reporting done for their benefit, would adversely affect purchasers in Wisconsin.

Alternatively, the "more" that is required to establish jurisdiction under § 801.05(4) would be the selling of natural gas that was then placed into a distribution system designed and controlled by the defendants that distributed products across the United States, with knowledge that Wisconsin was connected and not excluded from that distribution system. Wis. Stat 801.05(4) provides jurisdiction where injury to persons or property arises out of any act or

---

[7] S*ee, e.g., World-Wide Volkswagon Corp. v Woodson* 444 U.S. 286, 297 (1980) (local New Jersey car dealer had insufficient contacts with Oklahoma); *see also Dittman v Code-A-Phone* 666 F. Supp. 1269 (N.D. Ind. 1987)(a company that was a major distributor of phones had sufficient contacts with Indiana)

omission outside of Wisconsin by a defendant provided that "[p]roducts, materials or *things processed*, serviced or manufactured by the defendant were used or consumed within this state in the ordinary course of business."  (Emphasis added.)  These terms are to be construed broadly: the term "processed" should be interpreted to include *a distributor's purchase and sale of goods* in the normal course of the distribution of those goods.  *Nelson by Carson v. Park Industries Inc.*, 717 F.2d 1120, 1124 n.5 (7th Cir. 1983), *cert. denied sub nom. Bunnan Tong & Co. Ltd.,* 465 U.S. 1024 (1984), noted  with approval in *Kopke*, 245 Wis. 2d at 413.  The plaintiffs should be permitted to have a reasonable amount of time so as to be able to gather sufficient evidence to clearly explain the defendants' role in the interstate distribution of natural gas, and how defendants profited from inflated prices paid by Wisconsin businesses during the Relevant Time Period.

The defendant group here is made up of the major distributors in the industry who engaged in false reporting.  A "manufacturer *or major distributor* should not be allowed to profit from the sale of its product in a state, while simultaneously insulating itself from liability by establishing an indirect and multi-faceted chain of distribution."  *Rockwell Int'l Corp., v Costruzioni Aeronautiche Giovanni Agusta S.p.A.* 553 F. Supp 328, 334 (E.D. Pa. 1982) (emphasis added), *citing Poyner v Erma Werke GMBH*, 618 F.2d 1186, 1190 (6th Cir. 1980) *cert denied* 449 U.S. 841 (1980).

In *Rockwell*, the overseas manufacturer was found to have "purposefully availed itself" of the benefits of the forum state, because it knew the parts it manufactured would be used in both Europe and the United States (including in the forum state), and it profited from those sales.  *Id.* at 331-32.  The court in *Rockwell* contrasted that with the situation such as in *World-Wide Volkswagon* where the customer itself took the product to the state.  *Id.*  The court held that bulk

delivery to a company known to distribute in the territory, in volumes such that the manufacturer would expect to benefit from the wholesaler's ability to distribute such volumes, was sufficient to meet the due process requirement for specific jurisdiction. *Id.,* at 334. Similarly, the court in *Abuan v. General Electric Co.* court refused a defendant's motion to dismiss where, despite having contacts only "through third party intermediaries," the product reached the territory. *Id.,* 735 F. Supp. 1479, 1486 (D. Guam 1990). The court in *Abuan* held that *Asahi* suggested that if the product's presence in the market arose from the efforts of the distributor to serve directly *or indirectly* the state market in question, it was reasonable to find specific jurisdiction in a suit arising out of the presence of that product. *Id., see also Montelbano v. Easco Hand Tools* 766 F.2d 737 (2nd Cir. 1985) (deliberate decision to market via an interstate distribution network reaching the forum state supports jurisdiction).

Likewise, in *Nelson by Carson*, the court held that the relevant scope of the foreseeable market for a product is "generally broader with respect to manufacturers and *primary distributors* of products who are at the start of a distribution system and who thereby serve, directly or indirectly, and derive economic benefit from a wider market." 717 F.2d at 1125-26 (emphasis added) (collecting cases); *compare World-Wide Volkswagen,* 444 U.S. at 297 (where the defendant that the Oklahoma court did not have personal jurisdiction was not a primary distributor, but only a local New Jersey dealer). A critical factor for the Seventh Circuit in *Nelson* was "whether [the distributor was] aware of [the retailer's] distribution system," such that it knew its actions were likely to have affects in the forum state. 717 F.2d at 1126.

In this case, the trading and marketing companies are not local retailers at the end of a distribution chain, but instead are "primary" or "major" distributors, that could only profit from their making false market reports *if there were buyers that were buying.* In the United States

natural gas is distributed and stored through a nationwide network of pipelines, and the plaintiffs believe they can establish, if discovery is permitted, that much of the pipelines are owned by the defendants or their affiliated companies.  The plaintiffs believe they can establish, if jurisdictional discovery is permitted, that the traders knew the gas they sold was delivered to purchasers in Wisconsin through pipelines owned by defendants or their affiliates.  Although the corporate structures and distribution chains established by the defendants are complex, a "major distributor should not be allowed to profit from the sale of its product in a state, while simultaneously insulating itself from liability by establishing an indirect and multi-faceted chain of distribution."  *Rockwell,* 553 F. Supp at 334.

### B.    Conspiracy and Personal Jurisdiction.

An alternative ground for the Court's exercise of personal jurisdiction in this case would be based on the doctrine of conspiracy jurisdiction.  The essence of this case is a conspiracy under Wis. Stat. § 133.03.  The Wisconsin legislature in Wis. Stat. § 133.01 has expressly indicated the important public policy that is intended to be advanced by Wis. Stat. ch. 133. Given that ch. 133 is to be broadly construed to achieve its remedial purpose of protecting Wisconsin consumers from manipulated prices, and that courts are to liberally construe § 801.05 such that it is co-extensive with the limits of due process, it makes sense for a federal court to give careful consideration to whether the Wisconsin Supreme Court, if it were to consider the issue, would conclude that when it comes to Chapter 133, conspiracy jurisdiction applies.

This is an issue of first impression, as no court has considered the interplay between Wis. Stat. ch. 133 and Wis. Stat. § 801.05.  Attributing the acts of one conspirator to a co-conspirator is the norm under Wisconsin law.  *Boyce v. Independent Cleaners*, 206 Wis. 521, 240 N.W. 132, 135 (1932) ("When, by compulsion or voluntarily, one joins with others and performs for them,

his acts become their acts."); *Lane v. Sharp Packaging Sys., Inc.*, 248 Wis. 2d 380, 391-92, 635

N.W.2d 896, 902 (Ct. App. 2001); *Segall v. Hurwitz*, 114 Wis. 2d 471, 481, 339 N.W.2d 333,

337 (Ct. App. 1983).  There is nothing stated in either Chapter 133 or § 801.05 indicating that the

acts of co-conspirators should not be considered for jurisdictional purposes.  Moreover,

Wisconsin courts hold that in interpreting Chapter 133, courts should look to and interpret

Wisconsin antitrust law consistent with federal antitrust jurisprudence.  *See, e.g., Grams v. Boss,*

97 Wis. 2d 332, 346, 294 N.W.2d 473 (1980).  In other jurisdictions, in cases involving federal

antitrust claims, courts have attributed the acts of co-conspirators to each other for jurisdiction

purposes.  *Simon v. Phillip Morris, Inc.,* 86 F. Supp. 2d 95, 119 (E.D.N.Y. 2000); *Jung v. Ass'n*

*of American Med. Colls.*, 300 F. Supp. 2d 119, 141 (D.D.C. 2004).

Jurisdictional discovery should be allowed to enable the plaintiffs to obtain further

information regarding the interconnections between the defendants, and how their actions in

support of the conspiracy were connected to and affected the Wisconsin market.

The great majority of courts that have considered the issue recently have concluded that

acts of co-conspirators are attributable to each other for all purposes, including for personal

jurisdictional purposes.  *See Second Amendment Found. v. United States Conference of Mayors*,

274 F.3d 521, 524 (D.C. Cir. 2001); *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan,* 115 F.3d

1020, 1030-31 (D.C. Cir. 1997);  *Edmond v. United States Postal Serv. Gen. Counsel,* 949 F.2d

415, 424-25 (D.C. Cir. 1991);  *Textor v. Board of Regents of N. Ill. Univ.*, 711 F.2d 1387, 1392-

93 (7th Cir. 1983); *Remmes v. Intern. Flavors & Fragrances,* 435 F. Supp. 2d 936, 940-42 (N.D.

Iowa 2006); *Jung,* 300 F. Supp. 2d at 141 (D.D.C. 2004); *Remmes v. Intern. Flavors &*

*Fragrances,* 389 F. Supp. 2d 1080, 1093-94 (N.D. Iowa 2005); *Kohler Co. v. Kohler Int'l, Ltd.,*

196 F. Supp. 2d 690, 697 (N.D. Ill. 2002); *Simon, 86* F. Supp. 2d at 119-20 (E.D.N.Y. 2000);

*United Phosphorus, Ltd., v. Angus Chem. Co.,* 43 F. Supp. 2d 904, 912 (N.D. Ill. 1999); *In re N. Dakota Personal Injury Asbestos Litig.  No.1,* 737 F. Supp. 1087, 1097-98 (D. N.D. 1990); *Gemini Enters. Inc. v. WFMY Television Corp.*, 470 F. Supp. 559, 564 (M.D.N.C. 1979);  *Merkel Associates, Inc. v. Bellofram Corp.*, 437 F. Supp. 612, 617 (W.D.N.Y. 1977);  *McLaughlin v. Copeland,* 435 F. Supp. 513, 529-533 (D. Md. 1977);  *Socialist Workers Party v. Attorney Gen. of the U.S.,* 375 F. Supp. 318, 321 (S.D.N.Y. 1974).  "The 'conspiracy theory' of personal jurisdiction is based on the 'time honored notion that the acts of [a] conspirator in furtherance of a conspiracy may be attributed to other members of the conspiracy.'" *Textor,* 711 F.2d at 1392 (citations omitted).   Courts have used this theory to assert jurisdiction "over [those] whom jurisdiction would otherwise be lacking."  *In re Arthur Treacher's Franchisee Litigation,* 92 F.R.D. 398, 411 (E.D. Pa. 1981).

Not all courts that have considered the doctrine have applied it in all cases.  *See, e.g., Insolia v. Philip Morris Inc.*, 31 F. Supp. 2d 660 (W.D. Wis. 1998).   In *Insolia* the plaintiffs were smokers who alleged personal injury claims of negligence and strict liability against a group of tobacco companies.  In its 1998 decision in that case, this court declined to attribute the acts of an American subsidiary to a British parent corporation.  This case, however, is distinguishable from *Insolia* because:  (i) it does not involve any foreign national corporations; and (ii) this case is brought under Wis. Stat. ch. 133, and Wisconsin courts have a mandate under that statute to protect free competition.  *Insolia* is also distinguishable on grounds of the unusually distant corporate structure involved in that case.   As the court explained in *Insolia*, the ultimate parent did have direct ownership in the defendant subsidiary company, which subsidiary manufactured and distributed cigarettes in Wisconsin.  Furthermore, the court noted that the extent of control over the defendant subsidiary company seemed to be that the parent "set broad

17

policy directives … on an annual basis." *Id.*, 31 F. Supp. 2d at 670.  The court emphasized that "it is virtually inconceivable that [an ultimate parent holding] company of fewer than 200 employees could oversee the tens of thousands of workers employed by [the defendant subsidiary] while, at the same time, exert some control over 499 other subsidiaries" across the globe.  *Id.*  Plaintiffs ought to be allowed to conduct discovery to determine whether a similar virtually-complete "hands off" operational style exists in this case between the parents and subsidiaries, or whether a different operational style was practiced.   Ultimately though, because Wis. Stat. § 801.05 is silent as to whether acts of conspirators in a Chapter 133 case should be attributed to each other, it makes no sense, and is contrary to good public policy, to read into or graft onto § 801.05 a prohibition of such.

### C.       Personal Jurisdiction and Discovery.

Although the plaintiff bears the "minimal burden" of ultimately demonstrating facts that support personal jurisdiction, *Kopke,* 245 Wis. 2d at 410*,* it is well established that "courts are to assist the plaintiff by allowing jurisdictional discovery unless the plaintiff's claim is 'clearly frivolous.'"  *Toys R. Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 456 (3d Cir. 2003)(overturning the district court's denial of a motion for discovery).  While a different standard may apply where a foreign national corporation is the moving defendant, or where the case arises out of a specific jurisdiction contract between the parties (such that the parties are not "strangers" to each other),[8] courts have held that no showing of possible **general** jurisdiction is necessary to warrant jurisdictional discovery. *See, e.g.,  Marshall v. McCown Deleeuw & Co.*, 391 F. Supp. 2d 880, 883 (D. Idaho 2005).  Most courts take a generally liberal approach to allowing discovery

---

[8] *See, e.g., Central States, S.E. and S.W. Areas Pension Fund v. Phencorp Reinsurance Co.*, 230 F.3d 934 (7th Cir. 2000) (indicating "foreign nationals" usually should not be subjected to "extensive" jurisdictional discovery); *Ellis v. Fortune Seas, Ltd,* 175 F.R.D. 308, 312 (S.D. Ind. 1997) (where the defendant was not a "stranger" to plaintiff, and alleged only specific jurisdiction basis, this fact "plays an important part" in a court's denial of a request for further jurisdictional discovery).

relating to jurisdictional issues to occur: "When a defendant moves to dismiss for lack of jurisdiction, either party should be allowed discovery on the factual issues raised by that motion." *Sizova v. Nat'l Inst. of Standards & Tech.,* 282 F.3d 1320, 1326 (10th Cir. 2002). While courts are vested with broad discretion in determining whether discovery should be allowed, that discretion is abused "when the denial results in prejudice to the plaintiff" (*Id.,* at 1326); prejudice exists "where pertinent facts bearing on the question of jurisdiction are controverted . . . or where a more satisfactory showing of the facts is necessary" (*Id.*).

Courts within the Seventh Circuit share in the opinion that a party asserting jurisdiction need only provide some "colorable basis" for believing that general jurisdiction may exist, to warrant jurisdictional discovery. *See Ellis v. Fortune Seas, Ltd.*, 175 F.R.D. 308, 312 (S.D. Ind. 1997) (requiring merely a "threshold" or "'colorable' showing of a plausible basis for exercising jurisdiction."); *see also Central States*, 440 F.3d at 876; *Owner Operator Resources, Inc. v. Maag*, No. 1:02-CV-332, 2003 WL 21911061, *5 (N.D. Ind. March 28, 2003). In *Black & Decker, Inc. v. Shanghai Xing Te Hao Indus. Co.*, the Northern District of Illinois granted a motion for jurisdictional discovery, where the plaintiff has merely "identified several possible bases for personal jurisdiction, which, upon further discovery, may prove sufficient." No. 02-c-4615, 2003 WL 21383325 (N.D. Ill. June 12, 2003).

Here, the Court should permit jurisdictional discovery because plaintiffs' claims are certainly not "clearly frivolous," or alternatively because "a more satisfactory showing of the facts is necessary."

As to the plaintiffs' claims not being "clearly frivolous," the many fines paid by the parties to this case, the convictions and guilty pleas by industry traders, and the conclusion of the attorneys general's report, plainly show there is a basis for the plaintiffs' claims that a price

manipulation conspiracy occurred, that the defendants were connected to the conspiracy, and that

the conspiracy harmed purchasers of natural gas in Wisconsin.  (*See* Background Section, supra).

Alternatively, as to "a more satisfactory showing of the facts [being] necessary," by the

assertions included in the movants' declarations, it is clear that the defendants acknowledge that

the parent corporations were included in this case—as they have been in many other natural gas

cases—because the plaintiffs are asserting that the parent corporations are liable for the actions

of their subsidiary corporations.

> [T]he existence of the corporation as an entity apart from the natural persons comprising it will be disregarded, if corporate affairs are organized, controlled and conducted so that the corporation has no separate existence of its own and is the mere instrumentality of the shareholder and the corporate form is used to evade an obligation, to gain an unjust advantage or to commit an injustice.

*Weibke v. Richardson & Sons, Inc., 83* Wis. 2d 359, 363, 265 N.W.2d 571(1978) (*quoted in*

*Consumer's Co-op. of Walworth County v. Olsen*, 142 Wis. 2d 465, 476, 419 N.W.2d 211

(1988)).  The assertions included in the movants' declarations fail to address many of the factors

that are relevant to resolving whether the parent corporations here are liable for the acts of their

wholly-owned, energy-trading subsidiaries.

The "piercing the corporate veil" doctrine in Wisconsin involves the consideration of

many factors, on which the movants' declarations are silent.  Factors that a court will consider

when determining whether in a particular case to disregard separate corporate entities in a parent

and subsidiary situation include:

> [W]hether there was: 1) common stock ownership, 2) overlapping directors and officers, 3) combined use of corporate offices, 4) capitalization of the subsidiary by the parent, 5) financing of the subsidiary by the parent, 6) control of subsidiary's stock by parent, 7) use of subsidiary's property by parent, 8) inter-corporate loans, 9) parental incorporation of the subsidiary, 10) consolidated tax returns, 11) independent decision making by the subsidiary, 12) independent decision making by the directors of subsidiary, 13)

observance of formal corporate legal requirements, 14) contracts
between the subsidiary and parent, and 15) fraud or injustice to
third-parties.

*Cemetery Services, Inc. v. Wisconsin Dept. of Regulation and Licensing*, 221 Wis. 2d 817, 827,

586 N.W.2d 191 (Ct. App. 1998); *accord Conservatorship of Prom v. Sumitomo Rubber*

*Industries, Ltd.,* 224 Wis. 2d 743, 760-61, 592 N.W.2d 657 (Ct. App. 1999).

The movants' declarations fail to address the above facts, and are otherwise filled with

ambiguities.  For example, the declaration of Lawrence Wall, submitted in support of the motion

to dismiss of defendant Duke Energy Trading and Marketing, L.L.C. ("DETM"), is filled with

pregnant silences:

- Mr. Wall indicates that during the Relevant Time Period DETM was engaged in
the purchase and sale of natural gas on a wholesale basis, but is silent as to
whether it sold natural gas on a wholesale basis that was consumed in Wisconsin
during that time.

- He indicates he has found no record of a sale to the four *named* plaintiffs, but is
silent as to whether there are records of sales to other commercial entities in
Wisconsin.

- He indicates he has found no record of DETM having "participated in any
transactions for the sale of natural gas in Wisconsin after 2004 . . . [or] having
participated in any transactions for purchase of natural gas in Wisconsin after
June 2005,"[9] but is silent as to such sales or purchases during the Relevant Time
Period, and the volume of such sales and purchases during the Relevant Time
Period.

- He identifies that there are affiliates of DETM, and that he had "regular contact
with officers and employees of DETM" while an officer with another affiliate
during the Relevant Time Period, and also that he had "knowledge of DETM's
operations with regard to natural gas . . . trading at the time," but is silent as to the
"piercing" or "control" factors discussed in such case as *Cemetary Services,*

---

[9] Mr. Wall also does not define whether he gives a narrow or broad definition to the terms he uses.  Does
"participated in any transactions for sale of natural gas in Wisconsin [or] purchase of natural gas in Wisconsin" require a
DETM trader to be present in Wisconsin to fit his definition, or involve delivery in Wisconsin, or what?  Plaintiffs ought
to be able to depose Mr. Wall (and the other executives from other companies who have provided similarly carefully-
worded affidavits) to find out if the meanings suggested by the precise words used, are indeed supported by facts and are
the meanings the executives meant.  It is not uncommon for a lawyer to discover in a deposition that assertions in a
witness' affidavit—while not exactly untrue—are far from complete.

21

> *Consumer's Co-op,* and *Conservatorship of Prom,* and is silent about what he and other executives at Duke knew about the illegal trading activities that led to DETM being ordered to pay a $28mm fine by the CFTC.

All of the above silences and ambiguities "cry out" for further investigation and explanation, and such can only occur if this Court permits the plaintiffs to engage in jurisdictional discovery.

The plaintiffs and the Court should not have to "take their word for it." Instead, the plaintiffs should be permitted, for instance: to depose the employee-traders who have been indicted for engaging in market manipulation and/or who have been identified in CFTC orders as having engaged in market manipulation, to find out who knew what when, and who endorsed their actions. Given the size of the transactions, corporations and losses involved in this case, it is not overly burdensome or unfair to require the defendants to respond to discovery relative to the jurisdictional and piercing issues.

As is apparent from some of the affidavits submitted, the corporate structures of some of the defendants are quite complex. (*See, e.g.,* the declaration relating to the Duke defendants.) Such raises the suspicion not only that the complex corporate structure was intentionally created by the movants with an idea toward insulating the parent corporation from liability for the acts of the subsidiary, but that the subsidiary was inadequately capitalized for the foreseeable liabilities of the subsidiary. Discovery should be permitted on this issue.

Allowing discovery to occur before resolving the motions to dismiss here would be entirely consistent with what federal Wisconsin courts have done in prior cases. For example, in *Insolia v. Phillip Morris,* a case relied upon by several of the movants, this Court allowed discovery to occur **for more than a year** before resolving the personal jurisdiction motion. *Id.,* 31 F. Supp. 2d at 673. In that case, as here, complicated corporate structures are involved, and

issues of agency and piercing the corporate veil exist.[10]   Similarly, in many other cases courts have allowed jurisdictional discovery to occur for a time period prior to resolving motions to dismiss.  *See, e.g., Black and Decker*, 2003 WL 21383325, *4 (court stays ruling on motion to dismiss to allow eight weeks for jurisdictional discovery, and sets further briefing schedule after discovery completed); *Owner Operator*, 2003 WL 21911061, *8 (allowing discovery until specified 30(b)(6) depositions could be completed); *Yusef v. Adams*, No. 2003-76, 2004 WL 715837, *2 (D. Virgin Islands, March 29, 2004) (court allows sixty days for jurisdictional discovery, and an additional 30 days after discovery closed for plaintiffs to supplement their opposition or amend the complaint); *Nat. Union Fire Ins. Co. of Pittsburgh, PA v. Aerohawk Aviation, Inc.*, 259 F. Supp. 2d 1096, 1106-07 (D. Idaho 2003) (90 days of additional jurisdictional discovery permitted); *Orchid Biosciences, Inc. v. St. Louis University*, 198 F.R.D. 670 (S.D. Cal. 2001) (roughly 70 days permitted to allow jurisdictional discovery and further briefing).

A dismissal of the parent corporations, if such were to occur, may mean no relief would be available for the wrongdoing engaged in by the subsidiaries of the parent corporations.  It appears that since the Relevant Time Period, some of the defendants have suspended the operation of their trading units that were directly involved in the conspiracy, and which were substantially fined by the CFTC.  (*See* Pendleton Dec. ¶ 6.)  It may be the case that the trading units of some of the parent corporations no longer have the assets that would be required to pay back the benefits those trading companies earned based on the inflated prices in the Wisconsin market, and which benefits may have been improperly stripped from those companies by their

---

[10] It appears that in *Insolia* only one defendant moved to dismiss on personal jurisdiction grounds, so the plaintiff was faced with the task of having to conduct discovery regarding essentially only one complicated corporate structure.  Here, of course, eleven defendants have moved to dismiss, so the discovery task here may well be greater than it was in *Insolia*.  Nevertheless, assuming defendants cooperate with plaintiffs jurisdictional discovery requests, the plaintiffs believe that jurisdictional discovery can be completed in 90 to 120 days.

parent companies, in a situation in which the parent companies knew the liabilities the subsidiary companies were facing.[11]

Here also, unlike some of the cases upon which defendants rely, there is no Asian or other foreign-national corporation, where from the outset it is abundantly clear that not only does the corporation have no operations in the United States, but also has no subsidiary that has a connection to the case.  In this case, all of the movants are **United States companies**, that have their principal places of business in the United States, and all of them are either listed companies on the New York Stock Exchange[12] or are subsidiaries of companies listed on the NYSE.[13]  If discovery is permitted here, the plaintiffs believe they will be able to establish that the defendant movants (i) raise capital and operate under a unified company name, (ii) refer to assets and activities of their subsidiaries as assets and activities of their own, and (iii) that many of the defendant movants actively represent themselves as being nationwide, integrated energy companies, or providing natural gas on a nationwide basis.

It is not at all unfair that a publicly traded United States corporation, with shareholders throughout the United States, which has a trading unit subsidiary that participated in what the *defendants* allege is a "nationwide" conspiracy, to be subject to jurisdiction on a nationwide basis.  The plaintiffs should be allowed to test the defendants' factual assertions through the discovery process, so that the Court can scrutinize whether the defendants narrow assertions in

---

[11] The statute that the plaintiffs sue under here is a unique statute.  Wis. Stat. § 133.14 indicates that any party that **"benefited from"** a void contract is liable to the plaintiffs up to the amount of that benefit, and in this case, that may include both the direct traders, and the parent holding companies.

[12] Movants American Electric Power Company, Inc., CenterPoint Energy, Inc., CMS Energy Corporation, Dynegy, Inc., OneOK, Inc. and Reliant Energy, Inc. are all listed on the NYSE.

[13] Movant AEP Energy Services, Inc. is a subsidiary of NYSE-traded American Electric Power Company, Inc.; Cantera Gas Company, LLC and CMS Energy Resource Management Company are subsidiaries of NYSE-traded CMS Energy Corporation; movants Duke Energy Carolinas, LLC and Duke Energy Trading and Marketing, L.L.C. are subsidiaries of NYSE-traded Duke Energy; movant Dynegy GP DMT Holding LP is a subsidiary of NYSE-traded Dynegy Inc.; movants OneOK Energy Services Co., L.P. is a subsidiary of NYSE-traded OneOK, Inc.; movant Reliant Energy Services, Inc. is a subsidiary of NYSE-traded Reliant Energy, Inc.

this case are consistent with the expansive assertions that the defendants have made to the investing and general public.

Essentially, to deny the plaintiffs the opportunity to engage in discovery on personal jurisdiction issues, would be to grant the moving defendants summary judgment, prior to allowing the plaintiffs the opportunity to conduct discovery and present to the Court evidence on the factual issues that the court is deciding here.

The defendants (except for one) are all non-Wisconsin companies with operations largely outside of Wisconsin due to the inherent nature of natural gas and the natural gas industry. Wisconsin produces no natural gas, and even though it is vital to the Wisconsin economy, it all has to come from out-of-state. But the natural gas consumed by Wisconsin (almost 2% of all natural gas consumed in the United States), had to come from some companies in the industry, and there is ample evidence that the price manipulation that occurred in the industry, which the defendants were involved in, significantly and adversely affected the Wisconsin market. At this early stage of the litigation, and given the number of defendants, the complexity of the corporate structures they created, and the significant damage caused to the Wisconsin economy by the defendants' conspiracy, the plaintiffs should be permitted to engage in jurisdictional discovery. To do otherwise would be to accept the defendants' tacit argument that they can engage in a conspiracy in the United States that significantly harms the Wisconsin economy and Wisconsin consumers, and that Wisconsin courts and Wisconsin antitrust law has no ability to provide a remedy for their significant wrongdoing.

## CONCLUSION

For all of the above reasons, and in the interests of justice, the plaintiffs respectfully request that this Court grant plaintiffs' request for jurisdictional discovery, and order that the plaintiffs have

some reasonable amount of time (120 days) to conduct discovery relating to the eleven personal jurisdiction motions to dismiss that have been filed.

Dated this 3rd day of April, 2007

Respectfully submitted,

/s/ Alexander T. Pendleton
ROBERT L. GEGIOS
ALEXANDER T. PENDLETON
WILLIAM E. FISCHER
KOHNER, MANN & KAILAS, S.C.
Washington Building
Barnabas Building Center
4650 N. Port Washington Road
Milwaukee, WI  53212-1059
(414) 962-5110; (414) 962-8725 (FAX)

R. LAWRENCE WARD
JENNIFER GILLE BACON
GREGORY M. BENTZ
SHUGHART THOMSON & KILROY, P.C.
1700 Twelve Wyandotte Plaza
120 W 12th Street
Kansas City, Missouri  64105-1929
(816) 421-3355; (816) 374-0509 (FAX)

DONALD D. BARRY
BARRY LAW OFFICES, L.L.C.
DONALD D. BARRY CHARTERED
5340 S.W. 17th Street
P. O. Box 4816
Topeka, Kansas 66604
(785) 273-3151; (785) 273-5115 (FAX)

**ATTORNEYS FOR PLAINTIFFS**