IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

ARANDELL CORPORATION, *et al.*,

                              Plaintiffs,                         OPINION AND ORDER

      v.

                                               07-cv-076-wmc

XCEL ENERGY, INC., *et al.*,

                              Defendants.

---------------------------------------------------------------------------------------------------------------------

NEWPAGE WISCONSIN SYSTEM INC.,

                              Plaintiff,

                                             09-cv-240-wmc

      v.

CMS ENERGY RESOURCE MANAGEMENT
COMPANY, *et al.*,

                              Defendants.

       In these consolidated cases, certain commercial and industrial consumers of natural gas in Wisconsin claim that defendants conspired to increase natural gas prices between 2000 and 2002.  After spending more than a decade in a multi-district ligation ("MDL") based in the District of Nevada, these cases were remanded back to this court for additional, pre-trial decisions and trial.  Pending before the court are two, lingering motions:  (1) plaintiffs' motion for reconsideration of the MDL court's grant of summary judgment as to certain of their claims following the Ninth Circuit's reversal of summary judgment decisions in related lawsuits; and (2) plaintiffs' motion for class certification under Federal Rule of Civil Procedure 23.  For the reasons that follow, the court will grant both motions.

OPINION

## I.  Motion for Reconsideration

### A.  Background

In the early 2000s, a group of natural gas traders, including many of the defendants in these two consolidated actions, allegedly manipulated the price of gas futures contracts on the New York Mercantile Exchange ("NYMEX").  In 2003, others who bought and sold natural gas futures on the NYMEX during this period filed class action lawsuits against the alleged price fixers in the Southern District of New York.  *See In re Natural Gas Commodity Litig.*, No. 03-CV-06186-VM (S.D.N.Y. Aug. 18, 2003).  The NYMEX defendants and class representatives entered settlements in 2006, which contained the following release:

> The Released Parties are finally and forever released and discharged from any manner of claims . . . and causes of action in law, admiralty, or equity, whether class, individual, or otherwise in nature, . . . whether known or unknown, suspected or unsuspected, whether concealed or hidden, or in law, admiralty, or equity, that the Representative Plaintiffs and other members of the Class who have not timely opted out of the settlement and excluded themselves from the Class ("Settling Plaintiffs"), or any of them, individually, or as a class (whether or not they make a claim upon or participate in the Settlement Funds), ever had, now have or hereafter can, shall or may have against the Released Parties arising from or relating in any way to trading in NYMEX Natural Gas Contracts (including purchasing, selling, or holding any NYMEX Natural Gas Contract or taking or making delivery of physical natural gas pursuant to any NYMEX Natural Gas Contract, or any combination thereof, whether as a hedger or speculator), whether or not asserted in the Action, including without limitation, claims which (a) arise from or relate in any way to any conduct complained of in any complaint filed in the Action, (b) have been asserted or could have been asserted in any state or federal court or any other judicial or arbitral forum against the Released Parties or any one of them, (c) arise

2

under or relate to any federal or state commodity price manipulation law, any state or federal unfair or deceptive business or trade practices law, or other law or regulation, or common law, including, without limitation, the Commodity Exchange Act, 7 U.S.C. § 1 et seq., the federal antitrust laws (as that term is defined in 15 U.S.C. § 12), or state antitrust laws and/or (d) the claims brought in this Action.  The Settling Plaintiffs, and each of them, are hereby enjoined from asserting any such claims against the Released Parties.

(Defs.' Opp'n, Ex. 2 (dkt. #210-3) ¶ 6.)[1]

In 2006 and 2009, these Wisconsin plaintiffs filed these two lawsuits in Wisconsin state courts, which were then removed to the Western District of Wisconsin,[2] claiming plaintiffs allege that defendants conspired to fix the price of natural gas by lying to privately-published price indices on which plaintiffs and other Wisconsin businesses relied in determining the price they paid to defendants for natural gas.  Four of the seven, named

---

[1] Unless otherwise noted, the docket citations are to Case No. 07-cv-076.

[2] Although these cases were reassigned to me following remand in September 2019, it was not until my recent consideration of the motions now before me that I realize the subject matter was somewhat familiar to me.  Specifically, sometime *well before* these lawsuits were even filed in Wisconsin state courts, and obviously well before I assumed the bench in 2010, I had been approached by some of the firm's clients and national counsel about the possibility of filing a separate lawsuit building on the claims in the NYMEX litigation under Wisconsin law.  As a result, I prepared a memorandum in conjunction with another antitrust lawyer based in my firm's Milwaukee office discussing the claims, cost of litigation and prospects of recovery were the firm to accept the representation on a quasi-contingency or contingency basis.  My recollection is that the memorandum prepared for the firm's contingency committee was very balanced, and that the committee ultimately declined to undertake the representation for various reasons, including potential conflicts with some of the firm's other clients.  Given that this involvement was short-lived, never resulted in acceptance of representation on behalf of any client, and occurred more than fifteen years ago, I have no qualms about undertaking this case ethically nor any concerns about my ability to approach the merits of the parties' claims impartially and without favor to either side.  Nevertheless, I would understand if any party were to feel otherwise for whatever reason.  To avoid any pressure, I would simply direct any party who may have a concern with my continuing to act as judge in this case to submit a confidential recusal request to our Clerk of Court, explaining your concerns, which will be taken up by Chief Judge James Peterson in consultation with the Clerk without my involvement.  Barring such a request within 14 days, I will proceed with these cases as assigned.

3

Wisconsin plaintiffs had been class members in the NYMEX litigation.

In light of numerous, similar suits filed around the country under applicable local state law, a number of which were filed before the Wisconsin actions, the Judicial Panel of Multidistrict Litigation ("JPML") had created an MDL in the District of Nevada to coordinate pre-trial proceedings. *See In re W. States Wholesale Natural Gas Antitrust Litig.*, MDL No. 1566, No. 2:03-cv-01431 (D. Nev.). At defendants' request, these two cases were transferred to the MDL action on June 14, 2007, and May 22, 2009, as tag-along actions. Material to plaintiff's motion for reconsideration, the MDL action also included cases brought by Reorganized FLI, Inc., the successor-in-interest to Farmland, in Kansas (the "*Farmland* action") and Sinclair Oil Corporation in Oklahoma and Wyoming (the "*Sinclair* action").

On July 18, 2011, the MDL court granted defendants' motion to dismiss plaintiffs' state law claims based on federal preemption grounds. However, the Ninth Circuit reversed; and on April 21, 2015, the Supreme Court of the United States affirmed that reversal. The cases were then remanded back to the MDL court and assigned a new judge.

On March 2, 2016, defendants next filed a motion for summary judgment in the *Farmland* action, arguing that the NYMEX class settlement release covered Farmland's claims in this litigation. The MDL court also granted that motion, finding claim preclusion barred Farmland's claims in light of the NYMEX release. Defendants then filed a similar motion in the *Sinclair* action, and, here, too, the MDL court granted summary judgment. As a result of these decisions, final judgments were entered in both cases, allowing each to appeal to the Ninth Circuit.

Defendants then filed a "virtually identical" motion against the four Wisconsin plaintiffs who were class members in the NYMEX litigation -- Arandell Corp., Briggs & Stratton Corp., Carthage College, and NewPage Wisconsin System Inc.  In their brief in support of that motion for summary judgment, defendants consistently represented that the "facts and legal issue" presented were "*virtually identical* to those the [MDL court] ha[d] already adjudicated in its order granting summary judgment in the *Farmland* case."  (Nero Decl., Ex. 9 (dkt. #206-9) 3 (emphasis added); *see also* Pls.' Opening Br. (dkt. #250) 12-13 (citing other representations by defendants that the Wisconsin actions are "indistinguishable" and "functionally identical" to the *Farmland* action).)  The MDL court agreed and granted summary judgment with respect to the claims asserted by these four Wisconsin plaintiffs against all but one of the defendants.[3]

On appeal to the Ninth Circuit, two separate three-judge panels reversed the MDL court's grant of summary judgment against the *Farmland* and *Sinclair* plaintiffs, finding that the class releases in the NYMEX litigation did *not* bar the physical gas purchase-related antitrust claims at issue in those cases.  *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 725 F. App'x 560 (9th Cir. 2018) (*Farmland*); *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 743 F. App'x 802 (9th Cir. 2018) (*Sinclair*).  In response to the first of these Ninth Circuit's decisions in *Farmland*, the Wisconsin plaintiffs naturally moved for reconsideration of the MDL court's grant of summary judgment against four of their group,

---

[3] In a footnote, defendants explain the MDL court's basis for not releasing the claims against this defendant, but argue this was an error and request that the court also grant summary judgment to defendant DMT GP LLC.  Because the court concludes that the Ninth Circuit's holding in *Farmland* requires reconsideration of the MDL court's grant of summary judgment as explained below, this request is obviously moot.

but the MDL court denied it because the appeal in *Sinclair* was still pending and could still uphold claim preclusion.  (Defs.' Opp'n, Ex. 11 (dkt. #210-12) 4.)  After the MDL court's decision in *Sinclair* was also reversed on August 1, 2018, the Wisconsin plaintiffs moved for reconsideration once again, and while the MDL court acknowledged the two reversals, it declined to address that motion.  Instead, the MDL court granted plaintiffs' request for suggested remand to the JPML, which was granted and left plaintiff's renewed motion for reconsideration to be decided by this court.

### B. Decision

In *Farmland*, the Ninth Circuit concluded that while "the language of the NYMEX Releases is broad enough to encompass [the] instant claims," the NYMEX litigation releases were not enforceable against the Farmland plaintiff under the "identical factual predicate rule," which limits the reach of prior class settlements to claims based only on identical facts.  *Farmland*, 725 F. App'x at 562-63.  Specifically, the court explained:

> A settlement agreement may preclude a party from bringing a related claim in the future 'even though the claim was not presented and might not have been presentable in the class action,' but only where the released claim is 'based on the identical factual predicate as that underlying the claims in the settled class action.'" *Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010) (quoting *Williams v. Boeing Co.*, 517 F.3d 1120, 1133 (9th Cir. 2008); *Class Plaintiffs* [*v. City of Seattle*], 955 F.2d [1268,] 1287 [(9th Cir. 1992)]. Therefore, although the parties "may have drafted the settlement agreement to include as broad a release as possible," the NYMEX Releases are "enforceable [only] as to subsequent claims ... depending upon the same set of facts." *Williams*, 517 F.3d at 1134 (emphasis in original and internal quotation omitted).

*Id.* at 563.

6

Applying this rule, the Ninth Circuit went on to hold that the *Farmland* and NYMEX lawsuits did *not* arise from identical factual predicates because Farmland's claims "depend[ed] on . . . a different cause of action (the Kansas restraint of Trade Act)" and "depend[ed] on proof of different facts to establish a different injury."  *Id.*   More specifically, the court held that:

> The terms of Farmland's physical gas contracts, the effect of Defendants' alleged misconduct on the performance and prices of the physical contracts, and the measure of Farmland's losses on the physical contracts due to Defendants' alleged misconduct, are all facts which [plaintiff] must prove in this action and which would have been unnecessary [to prove] in the NYMEX Action.

*Id.*

In reversing the MDL court's grant of summary judgment in *Sinclair*, the Ninth Circuit did not cite to the identical factual predicate rule, but again found that the facts underlying the *Sinclair* action were distinct from those asserted in NYMEX.  Accordingly, as in *Farmland* the Ninth Circuit concluded that the NYMEX release did not cover Sinclair's claims in the MDL action:

> The [release] agreement covers only claims "arising from" or "relating" to "trading in NYMEX Natural Gas Contracts," which are defined in the settlement as "any commodity futures (including any option thereon), basis, or swap contract related to natural gas that was traded on NYMEX, or any combination thereof, that was transacted or settled during the Class Period." The transactions at issue in these cases did not involve such trading; rather, they were direct retail purchases by Sinclair of gas from Defendants.

*Sinclair*, 743 F. App'x at 803.  The Ninth Circuit emphasized "[t]he fact that the same collusive conduct that gave rise to the claims in the NYMEX case may have also

affected the prices of retail purchases (whose prices were pegged to the NYMEX index) does not bring those retail purchases within the ambit of the settlement." *Id.* In so holding, the court of appeals rejected the MDL court's finding that claim preclusion barred Sinclair's claims. *Id.* at 803-04 ("Because the settlement agreement covers only claims arising from or relating to purchases of physical natural gas pursuant to NYMEX Natural Gas Contracts, it does not preclude Sinclair's claims in these cases.").

Having escaped this controlling law in the Ninth Circuit by remand from the MDL, defendants now argue that the "identical factual predicate rule" by that circuit differs from that adopted by the Seventh Circuit, and indeed any other federal circuit court of appeals who has examined this rule; and in "[a]pplying Seventh Circuit law," plaintiffs' claims were "released by the NYMEX settlement." (Defs.' Opp'n (dkt. #210) 15-16.) In particular, defendants contend that the Ninth Circuit requires not only that the "'factual predicates of each claim are identical' but also that (1) the claims are brought under the same cause of action and (2) result in identical injuries." (*Id.* at 18 (citing *Farmland*, 725 F. App'x at 563).) In further support, defendant cites to a treatise on class actions, which explains that "the Ninth Circuit—unlike every other Circuit—applies a stringent test that "distinguishes the 'identical factual predicate test' from the 'same transaction' test, viewing the former as narrower than the latter." (*Id.* (citing 6 Newberg on Class Actions § 18:19).)

There are at least two, core problems with defendants' argument. *First*, contrary to their representation, the treatise does *not* describe the Ninth Circuit as having adopted a minority view of this test; instead, the treatise simply notes that *one* Ninth Circuit case, *Epstein v. MCA, Inc.*, 50 F.3d 644, 664-65 (9th Cir. 1995), *rev'd on other grounds* 516 U.S.

8

367 (1996), "distinguished the 'identical factual predicate test' from the 'same transaction' test, viewing the former as narrower than the latter."  6 Newberg on Class Actions § 18.19 at 79 & n.16 (5th ed. 2016).  As importantly, from the court's review, *subsequent* Ninth Circuit cases have not adopted *Epstein's* characterization of the rule as "narrower."[4]  To the contrary, recent Ninth Circuit cases have defined the test as requiring a showing of the same claims *or* the same injury.  *E.g.*, *Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010) ("A settlement agreement may preclude a party from bringing a related claim in the future 'even though the claim was not presented and might not have been presentable in the class action,' but only where the released claim is 'based on the identical factual predicate as that underlying the claims in the settled class action.'") (quoting *Williams v. Boeing Co.*, 517 F.3d 1120, 1133 (9th Cir. 2008); *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1287 (9th Cir. 1992)).

Regardless, as far as this court could determine -- and as cited by the parties in their brief and in the Newberg treatise -- the Seventh Circuit has only addressed the identical factual predicate test in one case.  In *Williams v. General Electric Capital Auto Lease, Inc.*, 159 F.3d 266 (7th Cir. 1998), the Seventh Circuit actually quoted a *Ninth* Circuit precedent in defining the test as follows:  "[t]he weight of authority holds that a federal court may

---

[4] Curiously, defendants also argue in a footnote that the Ninth Circuit first articulated a rule requiring identical injuries in *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741 (9th Cir. 2006), a case that postdates *Epstein* by 11 years.  Moreover, in the court's review of the *Reyn's Pasta Bella* decision, there is no holding that the test does not apply absent a showing of identical injury. Indeed, the court *applied* the identical factual predicate test to conclude that plaintiff's subsequent claim was barred by the earlier class action release, explaining, "[w]hile Plaintiffs seek to hold Defendants liable by positing a different theory of anti-competitive conduct, the price-fixing predicate (price-fixing interchange rates) and the underlying injury are identical."  *Id.* at 749.  In other words, the court noted that the injuries were identical, while also noting that the factual predicate was also identical.

9

release not only those claims alleged in the complaint, but also a claim 'based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might not have been presentable in the class action.'" *Id.* at 273 (quoting *Class Plaintiffs*, 955 F.2d at 1287). Further, the Seventh Circuit applied the rule to affirm the district court's injunction of the second suit because both cases concerned the same leases and, therefore, found the rule applicable. Thus, contrary to defendants' argument, the Seventh Circuit did not reject -- or even consider -- whether the injury must be identical; instead, the court considered whether the fact that the leases were not terminated until after the settlement of the first case formed a basis for not applying the rule, concluding that it did not because the "the range of statutory damages available to individual plaintiffs should have been clear" at the time of settlement of the first case. *Id.* at 274.

*Second*, even if defendants could credibly argue that the Ninth Circuit has adopted a narrower test in some cases, the *Farmland* court relied on differences in the factual predicate of the MDL actions to determine that the NYMEX release did not bar that action. In particular, while the Ninth Circuit concluded that the *Farmland* action "depend[ed] on proof of different facts to establish a different injury," the court did *not* hold that it was the "different injury" that precluded application of the release to the claims at issue in the MDL action. 725 F. App'x at 563. Instead, the court set forth several facts that undermined a finding of an identical factual predicate, including "the terms of Farmland's physical gas contracts, the effect of Defendants' alleged misconduct on the performance and prices of the physical contracts, and the measure of Farmland's losses on

the physical contracts due to Defendants' alleged misconduct." *Id.* Moreover, the *Sinclair* court did not even mention a different injury; instead, it relied on the fact that the claim at issue involved direct retail purchases, as opposed to the NYMEX litigation. 743 F. App'x at 803. At minimum, defendants have failed to offer any basis for reading the Ninth Circuit's decisions in *Farmland* and *Sinclair* in a way that would result in a different application of the test than in other circuits.

Finally, the Ninth Circuit's finding of a different factual predicate is entirely consistent with the parties' treatment of the two actions in earlier court submissions. For example, defendants in the NYMEX litigation settlement papers represented that there were "no competing actions." (Pls.' Opening Br. (dkt. #205) 10.)[5] In response, defendants point out that the *Arandell* action was filed six months *after* the NYMEX settlement. While a valid distinction with respect to the two Wisconsin lawsuits, however, there is no dispute that there were *other* actions pursuing the same or similar antitrust claims based on sales of physical natural gas -- and, indeed, had already been transferred to the MDL court -- at the time of the NYMEX settlement. At minimum, therefore, the NYMEX litigation was viewed as distinct from the MDL claims pending and soon filed in this case at the time the NYMEX litigation was settled.

Accordingly, the court will grant plaintiffs' motion for reconsideration and will vacate the MDL court's grant of summary judgment to most of the defendants on claims

---

[5] Plaintiffs also point out that certain defendants objected to adding NYMEX litigation as a tag-along action to the MDL (Pls.' Opening Br. (dkt. #205) 9-10), although as defendants emphasize, none of the current defendants made such representations. (Defs.' Opp'n (dkt. #210) 13-14.)

asserted by plaintiffs Arandell Corp., Briggs & Stratton Corp., Carthage College, and NewPage Wisconsin System Inc.

## II. Motion for Class Certification

### A. Background

The seven, proposed class representatives are a wide variety of Wisconsin companies and institutions, ranging from a printer of catalogs, Arandell Corporation, to a manufacturer of metal components, Ladish, Co., Inc., to a liberal arts college, Carthage College. Defendants are (or were) engaged in marketing natural gas, which was often produced by or on behalf of corporate affiliates. In 2000, Wisconsin consumed approximately 389,543 MMCFs ("million cubic feet") of natural gas, and Wisconsin had thousands of industrial and commercial consumers. Defendants or their affiliates, including agents, sold gas to plaintiffs and members of the class, although as defendants point out in their brief opposing the certification of a class, defendants and their affiliates filled other roles as well, including, at times, being buyers of natural gas themselves. Nevertheless, plaintiffs contend that between 2000 and 2002, they and other putative class members purchased natural gas for their own use or consumption at artificially inflated prices due to defendants' manipulation of the market.

Natural gas is a classic commodity as one molecule of natural gas is perfectly substitutable for another. For this reason, natural gas is sold subject to standardized pricing terms for all consumers. In Wisconsin, pricing is set at various hubs located near Wisconsin's boarder with Minnesota, Illinois and the Upper Peninsula of Michigan.

Between 2000 and 2002, plaintiffs purchased gas at prices based on natural gas indices regularly provided by a few industry publications. Before updating the pricing indices periodically, the publications surveyed buyers and sellers to obtain data on natural gas sales and used that data to calculate price that gas sold at particular hubs. Plaintiffs routinely used these indices in contracts for natural gas, although as defendants point out in their opposition brief, these indices were not necessarily the *only* consideration in setting prices for plaintiffs' and others' gas purchases.

In 2003, the Federal Energy Regulatory Commission investigated price manipulation in the natural gas industry between 2000 and 2002, concluding in a March 2003 report, that there was "evidence of manipulation (direct and indirect) of the published natural gas price indices at significant trading points all over the United States." (Pls.' Opening Br. (dkt. #208) 16 (quoting Ennis Decl., Ex. A (dkt. #208-2) 143).) Specifically, the Report documented false reporting of prices, including reporting fictious trades and altering the volume or price component of actual trades. That Report specifically identified certain manipulative trading practices, including "wash trading," which is a prearranged pair of trades of the same good between the same parties, involving no economic risk and no net change, and "churning," which is a pattern of successive bursts of trading activity within a short period of time in an effort to give the appearance of market volatility to drive up prices.[6] Some of the defendants admitted wrongdoing. Defendants contend that none of these reports, however, found evidence of *inter*-company

---

[6] Defendants contend that standard market forces, not churning or other forms of market manipulation, produced volatility in the market during the relevant period. (Defs.' Opp'n (dkt. #211) 15-16.)

13

conspiracy; rather, this evidence simply reflected traders misreporting price-related information "for their individual *unilateral* reasons." (Defs.' Opp'n (dkt. #211) 17.)  The United States Department of Justice and the Commodity Futures Trading Commission also investigated price manipulation between 2000 through 2002, resulting in the imposition of various civil and criminal penalties on a number of the defendants, as detailed in plaintiffs' brief.  (Pls.' Opening Br. (dkt. #208) 19-20.)  Finally, during the course of discovery in these two cases, plaintiffs have also collected evidence of wash trades, which the MDL court concluded was indicative of an antitrust conspiracy.  (*Id.* at 22 (citing Ex. 31 (dkt. #208-46) 16-17).)

### B. Procedural History

As described above, because these cases were transferred to the MDL court, that court issued various decisions potentially relevant to plaintiffs' motion for class certification.   First, the MDL court resolved various *Daubert* challenges to plaintiffs' experts, including denying motions as to the expert opinions of Drs. Harris and Dwyer, who purport to have created a "but-for market model" to estimate natural gas prices during the relevant period had defendants not issued false reports and engaged in wash-trading and churning.   Plaintiffs rely on this methodology and these expert opinions to demonstrate that their damages claims are subject to common, classwide proof.

Second, the MDL court denied class certification to the Wisconsin plaintiffs in an opinion and order addressing four separate class certification motions.  However, on appeal to the Ninth Circuit, plaintiffs pointed to instances of limited analysis by the MDL court (and inconsistent or contradictory treatment rulings within the opinion), resulting in the

appellate court vacating the ruling.  In particular, the Ninth Circuit found error with the MDL court's finding that difficulty in calculating individual damages precluded class treatment.  Instead, the Ninth Circuit concluded that "the amount of damages is invariably an individual question and does not defeat class treatment."  (Ex. 7 (dkt. #208-16) 3.) The Ninth Circuit also criticized the lack of analysis in the MDL opinion, particularly criticizing the court's failure to discuss differences in the governing state laws, and noting that "[t]hese differences are particular acute with respect to the Wisconsin *Arandell* and *NewPage* actions."  (*Id.* at 4.)

Third, and finally, while the MDL court denied plaintiffs' motions for class certification, the court nonetheless certified a number of classes for settlement purposes with some of the defendants, including a Wisconsin class.  With respect to those classes, the court further concluded that the requirements under Rule 23 were satisfied, including commonality and predominance.  (Pls.' Opening Br. (dkt. #208) 32-34 (citing various orders).)

## C.  Decision

Plaintiffs seek to recover damages for a violation of Wisconsin Statute § 133.03, which renders antitrust conspiracies illegal in Wisconsin.  For relief, plaintiffs further point to two statutes, Wisconsin Statutes § 133.14 and § 133.18.  Section 133.14 provides for a "full consideration" recovery, as described below:

> All contracts or agreements made by any person while a member of any combination or conspiracy prohibited by s. 133.03, and which contract or agreement is founded upon, is the result of, grows out of or is connected with any violation of such section, either directly or indirectly, shall be void and no

15

> recovery thereon or benefit therefrom may be had by or for
> such person. Any payment made upon, under or pursuant to
> such contract or agreement to or for the benefit of any person
> may be recovered from any person who received or benefited
> from such payment in an action by the party making any such
> payment or the heirs, personal representative or assigns of the
> party.

Wis. Stat. § 133.14.  Plaintiffs also seek treble damages under § 133.18, which states:

> (1)(a) Except as provided under par. (b), any person injured,
> directly or indirectly, by reason of anything prohibited by this
> chapter may sue therefor and shall recover threefold the
> damages sustained by the person and the cost of the suit,
> including reasonable attorney fees. Any recovery of treble
> damages shall, after trebling, be reduced by any payments
> actually recovered under s. 133.14 for the same injury.

Wis. Stat. § 133.18.

Finally, plaintiffs seek to certify the following class under Rule 23(b)(3):

> All industrial and commercial purchasers of natural gas for
> their own use or consumption during the Relevant Time Period
> (January 1, 2000, to October 31, 2002), and which gas was
> used or consumed by them in Wisconsin.  Excluded from the
> Class are (a) entities that purchased natural gas for resale (to
> the extent of such purchase for resale); (b) entities that
> purchased natural gas for generation of electricity for the
> purpose of sale (to the extent of such purchase for generation);
> (c) entities that purchased natural gas from entities that sold
> natural gas at rates approved by the Wisconsin Public Service
> Commission (to the extent of such purchases at such approved
> rates); (d) defendants and their predecessors, affiliates and
> subsidiaries; and (e) the federal government and its agencies.

To certify a class under Federal Rule of Civil Procedure 23(b)(3), plaintiffs must

satisfy a two-step analysis.  *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811

(7th Cir. 2012).  First, the proposed class must satisfy the four threshold requirements

under Rule 23(a): numerosity, commonality, typicality and adequacy.  *Id.*  Second, the

16

proposed class must satisfy the two requirements under Rule 23(b)(3): predominance and superiority. *Id.* Current law further requires the trial court to engage in a "rigorous analysis" to determine whether the proposed class satisfies these Rule 23 requirements. *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 722 (7th Cir. 2011). As a result, the Rule 23 analysis may overlap with a determination of the merits of the case. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 352 (2011). When overlap occurs, "the judge must make a preliminary inquiry into the merits." *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001). If material factual disputes arise, the court may even be required to receive evidence and resolve those disputes before ruling on class certification. *Messner*, 669 F.3d at 811. However, resolving the factual dispute "should not turn the class certification proceedings into a dress rehearsal for the trial on the merits." *Id.*

Before turning to the discreet requirements for class certification, the court must address several of defendants' challenges that concern the standard governing plaintiff's motion or whether a presumption in favor of class certification exists in this case. As an initial matter, defendants would take issue with plaintiffs' pointing out that the MDL court certified a number of class action settlements against certain other defendants or defendant groups, and that while this motion has been pending, this court also certified a class for settlement purposes. (Dkt. ##228, 242, 244, 245). More specifically, defendant argues that any findings about class certification were "for settlement purposes only," and accordingly, are irrelevant, since the courts had *no* need to consider trial manageability or whether due process rights are implicated in the awarding of damages to non-injured plaintiffs in the context of certifying a class for settlement purposes. (Defs.' Opp'n (dkt.

#211) 9.)  The court agrees that these earlier findings by the MDL and this court for settlement purposes are not dispositive in determining if certification is appropriate for a full trial on the merits under Rule 23(b)(3).  While not immaterial, therefore, the court will place little weight on these prior decisions.

Next, defendants take issue with plaintiffs' submissions to the extent suggesting that there is a presumption that class certification is appropriate in antitrust cases.  However, the court does not view plaintiffs' brief as arguing for such a presumption; instead, as described below, plaintiffs simply directed the court to other antitrust cases where the Seventh Circuit has approved class action certifications, and argue that the reasoning in those cases apply with equal force in this case, particularly with respect to the commonality and predominance requirements.  Again, since defendants' framing does not reflect plaintiffs' actual argument, there is no presumption, while similar antitrust cases examining the appropriateness of class treatment of certain other antitrust claims are nonetheless instructive for the reasons described below.

Defendants also take issue with plaintiffs' reliance on the MDL court's rejection of certain challenges under *Daubert* and Federal Rule of Evidence 702 to plaintiffs' experts.  More specifically, defendants seem to be contending that an MDL court's finding that these experts' opinions are *admissible* does not mean plaintiffs have established the existence of a common method of proof.  Fair enough, but again the finding that these experts are qualified to render an opinion that is sufficiently reliable and will aid in the jury's determinations may well support a finding that plaintiffs have presented a credible theory for pursuing their claims on behalf of a larger class.

18

Finally, defendants spend much of their opposition brief challenging plaintiffs' evidence. As already acknowledged above, the court must have some understanding of the merits to assess whether plaintiffs have class-wide proof, but this is *distinct* from assessing the strength of these claims. Moreover, defendants' challenges mainly concern individual issues surrounding damages, which for the reasons explained below do not prevent class certification, just as the Ninth Circuit explained on appeal from the MDL court's denial of class certification *and* as reiterated by the Seventh Circuit in other cases challenging class certification. With these initial issues put to one side, the court turns to the requirements of class certification under Rule 23(a).

### A. Rule 23(a) requirements

#### 1. Numerosity

This requirement is satisfied when "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). In removing this action to federal court under the Class Action Fairness Act, defendants conceded that there were at least 100 class members. Moreover, the Energy Information Administration reported that Wisconsin had thousands of commercial consumers and nearly ten thousand industrial consumers of natural gas between 2000 and 2002. As defendants concede, therefore, the numerosity requirement is easily satisfied.

#### 2. Commonality

The commonality requirement is met when there are "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). A single, common issue will satisfy this

requirement if "capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke." *Dukes*, 564 U.S. at 339.  Under the commonality standard, however, plaintiff must do more than "merely" demonstrate "that they have all suffered a violation of the same provision of law."  *Id.* (internal quotation marks and citation omitted).  Plaintiff must show that "the class members have suffered the same injury."  *Id.*

In *Kleen Products LLC v. International Paper Company*, 831 F.3d 919 (7th Cir. 2016), the Seventh Circuit affirmed the grant of an antitrust class action where the plaintiffs alleged that "defendant companies agreed to restrict the supply of containerboard by cutting capacity, slowing back production, taking downtime, idling plants, and tightly restricting inventory," all resulting in a price increase that caused purchasers to pay more. *Id.* at 921-22.  In finding the commonality requirement satisfied in particular, the Seventh Circuit relied on "largely circumstantial" evidence "that, if believed . . . pointed to the existence of both agreement and actions to violate the antitrust laws."  *Id.* at 927.  (*See also* Pls.' Opening Br. (dkt. #208) 42 n.46 (citing other district court cases finding commonality satisfied in antitrust class actions where plaintiffs proposed demonstrating the elements of their conspiracy claims through common evidence).)

Here, plaintiffs point to the following common questions of law and fact:

- Whether defendants manipulated the price of natural gas by falsely reporting price and volume information, engaging in wash trades, churning or otherwise artificially causing demand to appear high;

- Whether defendants entered into agreements to set and maintain the price of natural gas by acts involving the illegal exchange of price information or the implementation of wash trades among themselves;

- Whether class members paid higher prices for natural gas and were thereby injured as a result of defendants' unlawful conduct, under Wis. Stat. § 133.18;

- The method for determining recovery under Wis. Stat. § 133.14 for the full consideration paid by class members pursuant to contracts involving prices tainted by defendants' actions; and

- The method for determining damages suffered by class members under Wis. Stat. § 133.18.

(Pls.' Opening Br. (dkt. #208) 43.)

In response, defendants contend that plaintiffs' claims are not subject to class-wide proof, pointing to differences between both plaintiffs and defendants. However, defendants' argument appears to mischaracterize plaintiffs' theory of liability. In particular, plaintiffs claim a *single* conspiracy to manipulate an interrelated market for natural gas prices, that affected each corner of the marketplace. Based on this theory, which of course plaintiffs must prove at trial, plaintiffs' experts Drs. Harris and Dryer offer their model that assesses and quantifies how defendants' alleged conspiracy impacted the market price. As such, the distinctions defendants attempt to tease out between plaintiffs' claims and defendants' defenses are not material to plaintiffs' claim premised on a single, interrelated market. Of course, defendants remain free to challenge plaintiff's theory, as may their own experts, as well as present evidence rebutting a view of a nationwide, interrelated natural gas market. Even so, plaintiffs have articulated a facially credible basis for a jury to determine their conspiracy claims at a class level.

Defendants also contend that plaintiffs cannot prove injury with evidence common to the class. While the court agrees that the degree of individual plaintiffs' injury (or impact, as plaintiffs prefer) is not susceptible to common proof, the *fact* of injury for

purposes of liability is.  While the need to show individualized injury in order to calculate damages at the class member level predominates over common issues is discussed below, plaintiffs' experts have articulated a credible theory for demonstrating that industrial and commercial consumers paid higher prices for natural gas for the period 2000 to 2002, across the market due to defendants' alleged conspiracy, regardless of whether gas was purchased based on indices or contracts.  *See Dekeyser v. Thyssenkrupp Waupaca, Inc.*, 314 F.R.D. 449, 454 (W.D. Wis. 2016) ("[T]he issue with respect to commonality is simply whether Plaintiffs have produced common evidence tending to prove their common assertion, and the opinion of their expert is just that."), *aff'd* 860 F.3d 918 (7th Cir. 2017). Moreover, plaintiffs need not show that every class member can prove injury to certify a class.  *E.g.*, *Kleen Prod.*, 831 F.3d at 927 (rejecting argument that every class member must show injury, explaining "[t]o the contrary, we said in *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750 (7th Cir. 2014), that '[i]f the [district] court thought that no class can be certified until proof exists that every member has been harmed, it was wrong'").

### 3.  Typicality

Rule 23(a) also requires typicality, which generally means a named plaintiff's claim "arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory."  *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998) (quoting *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983)).  For obvious reasons, this requirement often overlaps with the commonality requirement.  *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982).  However, this inquiry should ensure that "a plaintiff with typical claims will

pursue his or her own self-interest in the litigation, and in so doing, will advance the interests of the class members, which are aligned with . . . those of the representative." *Insolia v. Phillip Morris, Inc.*, 186 F.R.D. 535, 544 (W.D. Wis. 1998) (quoting 1 Newberg & Conte, Newberg on Class Actions § 3.13 (3d ed. 1992)).

Defendants also challenge whether this requirement is satisfied, but rely on the same arguments offered in response to commonality -- namely, that differences in how the plaintiffs purchased gas undermine a finding of typicality. Again, however, this argument misses the mark, since plaintiffs' theory is premised on a single, national market for natural gas. As such, the court rejects defendants' challenge and finds typicality satisfied for the same reasons as it found commonality satisfied.

### 4. Adequacy

The purpose of Rule 23's adequacy requirement is to ensure that "the representative parties will fairly and adequately protect the interest of the class." Fed. R. Civ. P. 23(a)(4). A class representative is not adequate if they are subject to a defense to which other class members are not subject or could not prove the elements of the class claim for reasons particular to them. *See CE Design Ltd*, 637 F.3d at 724–25. Here, too, defendants challenge plaintiffs' adequacy as class representatives based on differences in how they each purchased natural gas. Once again, this argument does not address plaintiff's theory of liability, premised on a single, nationwide market for natural gas; thus, at least for purposes of demonstrating the conspiracy itself, the differences between and among the class representatives and class members are not enough to question their adequacy. Nor do defendants point to any basis for finding that plaintiffs' interests are antagonistic to the

class as a whole or that defendants have defenses unique to some of the plaintiffs.  Plaintiffs also submitted declarations, attesting to the willingness to accept the responsibilities of class representatives.  (Pls.' Opening Br. (dkt. #208) 38 (citing declarations).)  The court, therefore, finds the adequacy of the class representatives satisfied.

In addition, the adequacy requirement also applies to class counsel.  *See Creative Montessori Learning Centers v. Ashford Gear LLC*, 662 F.3d 913, 917 (7th Cir. 2011).  Here, the MDL court concluded that class counsel are capable and experienced enough to represent the class, a finding that the Ninth Circuit did not disturb and that defendants do not challenge.  As such, the court agrees that the proposed class counsel can adequately represent the interests of the class members.

## B.  Rule 23(b) requirements

This just leaves the requirements of predominance and superiority, which as explained below are also satisfied here.

### 1. Predominance

The "predominance inquiry tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).  Predominance is not satisfied if "individual questions . . . overwhelm questions common to the class."  *Amgen Inc. v. Conn. Ret. Plans* & *Tr. Funds*, 568 U.S. 455, 468 (2013).  As discussed above, the court concluded that there are common questions of law and fact concerning:  (1) whether defendants manipulated the price of natural gas by engaging in false reports about pricing and volume information, wash trades

24

and churning (among other activities causing demand to appear higher than it was); (2) whether defendants entered into agreements to set and maintain the artificially high prices of natural gas; (3) whether class members paid higher prices because of defendants' actions; and (4) the method of determining damages.

Defendants contend that predominance is not satisfied because of individual issues concerning injury and, at least for some class members, demonstrating an agency relationship with certain natural gas middlemen, most notably Kaztex Energy Management, Inc., and WPS Energy Services, Inc.[7]

As detailed above, the court also concluded that plaintiffs could demonstrate the fact of injury or impact at a class-wide level by relying on their experts' models demonstrating price increases caused by defendants' alleged conspiracies.  Of course, to award damages to individual plaintiffs, inquiry at the individual level will be required.  Still, as the Ninth Circuit recognized in reversing the MDL court's denial of class certification, "the amount of damages is invariably an individual question and does not defeat class treatment."  (Ex. 7 (dkt. #208-16) 3.)   Indeed, the Ninth Circuit's understanding of managing individual issues surrounding damages in the context of analyzing the predominance requirements is entirely consistent with the Seventh Circuit's approach.  *See*

---

[7] The parties' dispute whether an agency relationship will need to be established to award damages under the treble damages provision, Wis. Stat. § 133.18, based on language in that statute allowing both direct and indirect purchasers to recover damages.  (Pls.' Reply (dkt. #225) 27.)  In response, defendants filed a motion for leave to file a sur-reply (dkt. #226), which the court will grant and has reviewed.  While the court is skeptical any showing of an agency relationship will require the detail and complexity that defendants posits, the court need not fully resolve this issue in light of its conclusion that individual issues surrounding damages, both the amount of injury and whether an agency relationship exists, do not predominate over the common issues.

*Messner*, 669 F.3d at 819 (rejecting district court's "approach [that] would come very close to requiring common proof of damages for class members, which is not required"); *Pella Corp. v. Saltzman*, 606 F.3d 391, 394 (7th Cir. 2010) (affirming grant of class certification, recognizing that "damages or causation may require individualized assessments").

Given the significant issues that *can* be resolved at the class level based on plaintiffs' theory of liability *and* the evidence of a single, nationwide natural gas market due to defendants' allegedly illicit actions, the court concludes that the predominance requirement is satisfied.

### 2. Superiority

Finally, the court must consider whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Relevant considerations include: (1) the class members' interests in individually litigating their claims; (2) the extent and nature of competing litigation; (3) the desirability of concentrating the litigation in the particular forum; and (4) the likely difficulties of managing a class action. *Id.* Ultimately, the case must be one "in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Prods.*, 521 U.S. at 615 (quoting Fed. R. Civ. P. 23(b)(3) advisory committee note to the 1966 Amendment).

While there will be challenges in navigating the individual issues surrounding damages as described above, if and when the time comes, the court nonetheless concludes that allowing this case to proceed as a class action is most likely to adjudicate the class's

26

claims fairly and efficiently.  Of course, if the case proves unwieldy (or if class counsel fails

to develop a robust plan for proving its claims and managing the class), then the court

could entertain a motion to decertify.  *See Teed v. Thomas & Betts Power Sols., LLC*, No. 08-

CV-303-BBC, 2012 WL 12888026, at *4 (W.D. Wis. Jan. 11, 2012) ("If the certification

of the class is later deemed to be improvident, the court may decertify.") (internal citation

and quotation marks omitted).  Because the court does not anticipate this will be necessary,

these consolidated actions may proceed as a class.


ORDER

IT IS ORDERED that:

1) Plaintiffs' renewed motion for reconsideration of the MDL court's Wisconsin
   NYMEX decisions ('076 dkt. #205; '240 dkt. #92) is GRANTED.

2) Plaintiffs' motion to certify class under Rule 23 ('076 dkt. #207; '240 dkt. #94)
   is GRANTED.

   a) The court CERTIFIES under Federal Rule of Civil Procedure 23(b)(3)the
      following class:

      All industrial and commercial purchasers of natural gas
      for their own use or consumption during the Relevant
      Time Period (January 1, 2000, to October 31, 2002),
      and which gas was used or consumed by them in
      Wisconsin.  Excluded from the Class are (a) entities that
      purchased natural gas for resale (to the extent of such
      purchase for resale); (b) entities that purchased natural
      gas for generation of electricity for the purpose of sale
      (to the extent of such purchase for generation); (c)
      entities that purchased natural gas from entities that
      sold natural gas at rates approved by the Wisconsin
      Public Service Commission (to the extent of such
      purchases at such approved rates); (d) defendants and
      their predecessors, affiliates and subsidiaries; and (e)
      the federal government and its agencies.

27

b) Plaintiffs Arandell Corporation, Merrick's, Inc., Sargento Foods, Inc., Briggs & Stratton Corporation, Carthage College Ladish Co., Inc., and NewPage Wisconsin Systems, Inc. are APPOINTED as class representatives.

c) Counsel for plaintiffs Kohner, Mann & Kailas, S.C., Perkins Coie LLP and Polsinelli PC are APPOINTED as class counsel.

d) The parties are directed to meet and confer on a proposed class notice. On or before July 15, 2022, the parties should submit a proposed notice. If they are unable to reach an agreement, on or before July 15, 2022, the parties should submit their own proposed versions; responses to the other parties' submission are due July 22, 2022.

3) Defendants' joint motion for leave to file sur-reply in opposition to class certification ('076 dkt. #226; '240 dkt. #113) is GRANTED.

4) Plaintiffs' letter to court seeking status update ('076 dkt. #262; '240 dkt. #149) is DENIED AS MOOT.

5) Plaintiffs' motion requesting trial date ('076 dkt. #265; '240 dkt. #152) is GRANTED.  The clerk's office is directed to set a telephonic conference with Judge Crocker to reset remaining pretrial deadlines and a trial date.

Entered this 28th day of June, 2022.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

28